# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:12-cv-14291-GRAHAM/LYNCH

MONIQUE L. WILLIAMS, an individual,

      Plaintiff,

vs.

DELRAY AUTO MALL, INC., a Florida
corporation, FGAP INVESTMENT CORP.,
a Florida corporation, and FRANZ MENARDY,
an individual,

      Defendants.

_____/

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff, Monique L. Williams, an individual ("Ms. Williams"), by and through her

undersigned attorney, pursuant to Rule 7.1C, Local Rules of the United States District Court,

Southern District of Florida, files this her Memorandum of Law in Opposition to the Motion to

Dismiss Amended Complaint [DE 16] filed herein by Defendants, Delray Auto Mall, Inc., a

Florida corporation ("Delray Auto Mall"), FGAP Investment Corp., a Florida corporation

("FGAP"), and Franz Menardy, an individual ("Mr. Menardy"):

## I.  INTRODUCTION

### A.  REVIEW OF AMENDED COMPLAINT ALLEGATIONS

#### 1.  Synopsis of Proceeding

As detailed below, Delray Auto Mall — a used car dealership — created a sham "buy

back" transaction to evade state usury laws. A "buy back" transaction typically involves a lender acquiring title to collateral from the borrower with the intent of reconveying title back to the borrower at a higher price to disguise interest. *See*, *Pope v. Marshall,* 78 Ga. 635 (1887); *Browner v. District of Columbia*, 549 A.2d 1107 (D.C.App. 1988); *Kuykendall v. Malernee*, 516 P.2d 588 (Ok.App. 1973); *Reitze v. Humphreys*, 125 P. 518 (Col.1912); *Kjar v. Brimley*, 497 P.2d 23,25 (Utah, 1973); *Bantuelle v. Williams*, 667 S.W.2d 810 (Tx.App.1983).

## 2. *Review of Factual Allegations*

According to the Amended Complaint, in December, 2008, using part of the settlement proceeds from a personal injury claim, Ms. Williams purchased a new 2009 Jaguar XF automobile with VIN: 5AJWA06B29HR40123 ("Vehicle" or "Jaguar") from a local dealership. Subsequently in May, 2012, Ms. Williams went to the place of business of Delray Auto Mall for the purpose of inquiring of Delray Auto Mall as to whether Ms. Williams could obtain a loan from Delray Auto Mall using the Jaguar as collateral. After listening to Ms. Williams discuss her financial circumstances, Delray Auto Mall through Mr. Menardy represented that Delray Auto Mall would be able to provide Ms. Williams with an unspecified amount of money as a loan using the Jaguar as collateral. Even though it was not clear to Ms. Williams how much money she would actually receive from Delray Auto Mall, Ms. Williams trusted Mr. Menardy and agreed to enter into a loan transaction with Delray Auto Mall  (Amended Complaint - ¶¶ 19-21).

In order to accomplish the so-called "loan transaction," Delray Auto Mall had Ms. Williams transfer the Jaguar to Delray Auto Mall, which then "resold" the Vehicle back to Ms. Williams, despite the fact the Jaguar never left the possession of Ms. Williams ("Buy Back Transaction"). As part of the fake "resale" to Ms. Williams, on May 26, 2012, Ms. Williams

executed and delivered various documents to effectuate the transfer from Ms. Williams to Delray Auto Mall and from Delray Auto Mall to Ms. Williams ("Buy Back Documents"). According to the Amended Complaint, Delray Auto Mall purposefully did not give Ms. Williams a complete set of the Buy Back Documents in order to conceal the fact that Delray Auto Mall was purloining several thousand dollars of equity in the Jaguar by increasing the "resale price" of the Jaguar (Amended Complaint - ¶¶ 22-25).

As part of the Buy Back Documents, Defendants presented a document to Ms. Williams entitled "Bill of Sale" ("Purchase and Finance Agreement"). In the belief that she would be receiving a needed loan of money, Ms. Williams executed and delivered the Purchase and Finance Agreement to Delray Auto Mall.  A copy of the Purchase and Finance Agreement is attached the Amended Complaint as Exhibit "A" (Amended Complaint - ¶¶ 26-28).

Under the Purchase and Finance Agreement, Ms. Williams allegedly financed $19,880.24 at a disclosed annual percentage rate of 22.34%. Pursuant to the Purchase and Finance Agreement, Delray Auto Mall provided the following disclosures to Ms. Williams concerning the terms and costs of credit:

| A.P.R. | Amount Financed | Finance Charge | Total of Payments |
|--------|-----------------|----------------|-------------------|
| 22.34% | $19880.24 | $10359.76 | $30240.00 |

The balance to be paid in 47 Monthly payments of $630.00
and one final payment of $630.00
The first payment is due on 06/25/2012
Lien Holder: FGAP INVESTMENT CORP
                PO BOX 6484
                DELRAY BEACH, FL 33482-6484

("TILA Disclosure Statement").

Pursuant to the TILA Disclosure Statement, Delray Auto Mall disclosed a "finance charge" of $10,359.76 ("Disclosed Finance Charge") (Amended Complaint - ¶¶ 29-31). Through the TILA Disclosure Statement, Delray Auto Mall also charged Ms. Williams the following fees which were "an incident to" and "a condition of" the extension of credit:

| "Dealer Prep:" | $  299.00 |
| "Doc Stamps:" | $    68.60 |
| "State Tax:" | $1,517.64 |
| TOTAL: | $1,885.24 |

("Buy Back Transactional Charges")

The Buy Back Transactional Charges were not disclosed as part of the "finance charge" by Delray Auto Mall as mandated by federal and state consumer finance laws. If the Defendants had not engaged in the sham Buy Back Transaction, the Buy Back Transactional Charges would not have been incurred  (Amended Complaint - ¶¶ 32-34).

Despite the TILA Disclosure Statement reflecting that the "amount financed" was in excess of $19,000.00, Ms. Williams only received approximately $4,300.00 from the "loan transaction." Through the Purchase and Finance Agreement, Delray Auto Mall also falsely represented that it had received a fictitious downpayment of  $7,000.00 ("Sham Downpayment") from Ms. Williams at the time of the transaction to "buyback" the Jaguar from Delray Auto Mall. Ms. Williams did not pay the Sham Downpayment to Delray Auto Mall; indeed, it is contrary to the compelling force of reason that Ms. Williams would have paid the Sham Downpayment to Delray Auto Mall if the purpose of the transaction with Delray Auto Mall was to obtain funds from Delray Auto Mall using the Jaguar as collateral (Amended Complaint - ¶¶ 35-37).

According to the Amended Complaint, Defendants through the sham Buy Back

Transaction, charged approximately $10,000.00 in undisclosed interest by inflating the "cash price" set forth in the Purchase and Finance Agreement.  The aforementioned hidden interest was in addition to the disclosed "finance charge" of $10,359.76.  Thus, according to the calculations of Ms. Williams, Defendants charged in excess of $20,000.00 in undisclosed finance charges (exclusive of the Buy Back Transactional Fees).

Under the TILA Disclosure Statement, Delray Auto Mall "sold" the Jaguar to Ms. Williams for a "cash price" of $24,995.00.   As Ms. Williams received only a few thousand dollars from the "loan" transaction, the difference in the "cash price" and the actual loan proceeds paid to Ms. Williams ("Buy Back Upcharge") constituted an additional "finance charge" which was not disclosed in the Purchase and Finance Agreement.

Subsequent to the consummation of the loan to Ms. Williams, Delray Auto Mall transferred the Purchase and Finance Agreement to FGAP, a corporation owned by Mr. Menardy (Amended Complaint - ¶¶ 38-40). Shortly thereafter, in July 2012, the Jaguar was repossessed after Ms. Williams not surprisingly fell behind in making the monthly payments of $630.00 to FGAP (Amended Complaint - ¶ 42).

### 3.  Review of Causes of Action

The history of usury regulation is to a large degree an account of conflict between the conviction that the lending of money at high interest rates is predatory and immoral and the fact that such money lending may be necessary for commerce.  See, generally, *The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Socio-Economic Role of Usury Laws in Today's Society.*  51 U.S.C. Law Review 35 (2000).  As a result of the conflict, the structure of credit statutes in most states

today mandates a usury ceiling riddled with statutory exceptions for particular creditors or transactions.  The statutory exceptions are known as "special" usury laws because of their limited scope to a specific area of finance, e.g., small loans, pawn brokers, etc.

Delray Auto Mall is authorized to extend credit to persons such as Ms. Williams under the authority of a special usury law, Florida Statute §520.01 *et sequi*, known more commonly as the "Florida Motor Vehicle Retail Sales Finance Act."  As such, Delray Auto Mall routinely extends credit up to the maximum rate of interest of thirty (30%) percent per annum in accordance with the provisions of the Act. However, as detailed in the Amended Complaint, as a result of the sham "buy-back," Defendants exceeded the statutory cap under the applicable Florida special usury law to the extent that the extension of credit to Ms. Williams was unlawful usury for which Defendants are liable.

As a result of the business activities of Defendants, Ms. Williams has filed an Amended Complaint seeking damages against Defendants for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et sequi* (Count I), violation of the Florida Motor Vehicle Retail Sales Finance Act ("FMVRSFA"), Florida Statute §520.01, *et sequi* (Count II), violation of the Florida Lending Practices Act, Florida Statute Chapter 687 (Count III), violation of Article 9, Uniform Commercial Code ("UCC")(Count IV), and for violation of the Florida Deceptive and Unfair Trade Practices Act ("the DUTPA"), Florida Statute §501.201, *et sequi* (Count V).

### B.  OVERVIEW OF TRUTH IN LENDING ACT

#### 1.  The Central Purpose of TILA is to Foster the Informed Use of Credit.

Congress stated the purpose of TILA as :

The informed use of credit results from an awareness of the cost thereof by

consumers. The purpose of this sub-chapter is to ensure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and to avoid the uninformed use of credit . . .

15 U.S.C. §1601.

The legislative history of TILA stresses this concept:

"[The Truth in Lending Act] will enable consumers to shop more intelligently for credit, to protect themselves from credit abuses, to resist more effectively such brutal rackets as loan-sharking and second-mortgage abuses . . ."

90 Congressional Record, p.14394 (May 22, 1968).

As the U.S. Supreme Court stated: "Congress enacted the Truth in Lending Act in part because it believed consumers would individually benefit not only from the more informed use of credit, but also from heightened competition which would result from more knowledgeable credit shopping." *Till v. SCS Credit Corporation*, 541 U.S. 465, 482 (2004); *Dixey v. Idaho First National Bank*, 677 F.2d 749, 751 (9th Cir.1982) [TILA "was passed to achieve the informed use of credit, which results from an awareness of cost thereof by consumers . . . the Act requires the disclosure of credit terms to consumers so that potential borrowers would be able to compare the available cost of credit"].

### 2.   *The Courts Broadly and Liberally Construe TILA as a Remedial Statute.*

It is universally recognized that TILA is a remedial statute that must be liberally interpreted in favor of borrowers to effectuate the consumer protection purposes. *See*, e.g., *Inge v. Rock Financial Corporation*, 281 F.3d 613, 621 (6th Cir.2002)*;* see, also, *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir.1989); *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir. 2004); *Carmichael v. Nissan Acceptance Corp.*, 291 F.3d 1278, 1281 (11th Cir.2002); *Rossman v. Fleet Bank*, 280 F.3d 384, 390 (3rd Cir.2002); *Ramadan v. Chase Manhattan Corporation*, 156

-7-

F.3d 499, 502 (3rd Cir.1988).

TILA imposes strict liability on creditors, even for technical violations. *See*, e.g., *Semar v. Platte Valley Fed. Sav. and Loan Ass'n,* 791 F.2d 699, 704 (9th Cir.1986).  Given TILA's public purpose to and the fact that Congress chose statutory damages as Congress' primary enforcement mechanism, that legislative judgment should not be eviscerated through an expansive reading of ambiguous exceptions. *IRS v. Clark*, 489 U.S. at 739. As detailed below, this Court should give the federal statute at issue herein the interpretation that best serves TILA's public interest.

### III.  STANDARD OF REVIEW

Until recently, federal courts routinely followed the pleading rules set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." However, pursuant to the recent United States Supreme Court opinion in *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955 (2007), to survive a motion to dismiss, a complaint must now contain factual allegations that sufficiently "raise a right to relief above a speculative level." *Twombly*, 127 S. Ct. at 1965.  As under *Conley*, the complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Id*. at 1964-65; *see*, *Stephens v. Dept. of Health and Human Services*, 901 F.2d 1571, 1573 (11th Cir.1990). A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all the necessary factual allegations. *Id*.  Accordingly, a well-pleaded complaint will survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id*. at 1965.

## IV.  LEGAL ARGUMENT

### A.  *MS. WILLIAMS HAS PROPERLY SET FORTH A CLAIM FOR VIOLATION OF THE TRUTH IN LENDING ACT FOR THE FAILURE OF DELRAY AUTO MALL TO PROPERLY DISCLOSE THE "TERMS OF CREDIT" OF THE VEHICLE BUY-BACK SCAM.*

#### 1.  *In their Motion to Dismiss, Defendants overlook the well-plead factual basis for the TILA claim.*

In their Motion to Dismiss, Delray Auto Mall and FGAP contend the Purchase and Finance Agreement provided compliant disclosures to Ms. Williams under TILA.[1]   The Defendants have overlooked that the gravamen of the TILA claim of Ms. Williams pertains to "hidden" charges that were not properly disclosed under TILA. To be concise, the TILA claim of Ms. Williams alleges four distinct violations:

- Inflated Cash Price- by the sham Buy-Back Transaction, the Defendants charged through the Buy-Back Upcharge approximately $10,000.00 of interest in the inflated "cash price" set forth in the Purchase and Finance Agreement (Amended Complaint - ¶38);

- Improper Disclosure of Buy-Back Transactional Charges - the Buy-Back Transactional Charges — including the dealer prep, doc stamps and sales

---

[1]  To support their position, Defendants have attached to the their Motion to Dismiss a document labeled "Exhibit A" which Defendants describe as being a "complete and accurate bill of sale." The second page of the proffered exhibit is a document entitled "Loan Agreement and Disclosure Statement Retail Installment Contract" ("Disputed RISC"). As alleged in her Amended Complaint, Ms. Williams did not receive a complete set of the Buy-Back Documents. To the extent that Defendants are presenting matters outside of the pleadings, if the Court converts the Motion to Dismiss into a motion for summary judgment pursuant to Rule 12(d), Federal Rules of Civil Procedure, Ms. Williams would respectfully request an opportunity to engage in discovery as to be afforded a reasonable opportunity to present all material that is pertinent to the motion.

tax — were not disclosed as part of the "finance charge" (Amended Complaint - ¶33);

- <u>Failure to Provide Proper Close-Ended Credit Disclosures</u> - in the event the Court determines that the Purchase and Finance Agreement was the document which provides the mandated disclosures under TILA, the disclosures were not "clear and conspicuous" as mandated by 15 U.S.C.§1632(a), were not properly segregated pursuant to Reg. Z, §226.17(a)(1), and did not have the descriptive explanation mandated by 15 U.S.C.§1638(a)(8). Further, the "finance charge"and "annual percentage rate" were not "more conspicuous" than the other required disclosures pursuant to 15 U.S.C. §1632(a); and

- <u>Delivery of Disclosures Prior to Consummation</u> - in the event the Purchase and Finance Agreement is determined not to be the document which provided the mandated disclosures under TILA, the Dealership further violated the TILA by failing to deliver the disclosures to Ms. Williams in a form she could keep prior to the consummation of the transaction as required under 15 U.S.C.§1638(b)(1) (Amended Complaint - ¶46).

The latter two violations of TILA are by and large self-explanatory and have been well covered by prior decisions of this Court. *See*, *Cannon v. Metroford, Inc.*, 242 F.Supp. 2d 1322 (S.D. Fla. 2002); *Brown v. SCI Funeral Services of Florida, Inc.*, 212 F.R.D. 602 (S.D. Fla. 2003). As such, Ms. Williams does not believe that a plenary discussion would benefit the Court. Accordingly, in the balance of her argument below, Ms. Williams will focus on the

unlawful hidden interest and charges incurred in the sham Buy-Back Transaction.

### 2.  The Defendants violated the TILA by placing finance charges consisting of the Buy-Back Upcharge into the sham "cash price"

In Truth in Lending matters, in determining the true nature of a transaction, "substance, not form, dictates."  *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748 (7th Cir. 2000); *Adams v. Plaza Finance Company*, 168 F.3d 932 (7th Cir. 1999).  By way of an example, a "cash price" of a product may be increased so that a seller can conceal that a finance charge was assessed. See, e.g., *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 at 366, 93 S. Ct. 1652, 36 L. Ed. 2d 318 (1978). Creditors frequently attempt to understate the true cost of credit by shifting charges out of the "finance charge"column and into the "amount financed" column.

The United States Supreme Court has long recognized the practice of hiding the finance charge in the price of goods sold:

> One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was "burying" the cost of credit in the price of goods sold. Thus, in many credit transactions in which the creditor has claimed that no finance charge had been proposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction.

> *Mourning,* 411 U.S. 356 at 366.

In the instant case, the retention by the creditor of approximately $10,000.00  - consisting of the Buy-Back Upcharge - from the amount financed by Ms. Williams constituted a finance charge that should have been added to the disclosed finance charge under the Purchase and Finance Agreement.

### 3.  The Buy-Back Transactional Charges were not disclosed
### as part of the "finance charge"

Through the artifice of the Buy-Back Transaction, Ms. Williams was charged $1,885.24

for the Buy-Back Transactional Charges that would not have been incurred but for the extension

of credit to Ms. Williams.

The TILA defines "finance charge" as follows:

> "The amount of the finance charge in connection with any
> consumer credit transaction shall be determined as the sum of all
> charges, payable directly or indirectly by the person to whom the
> credit is extended, and imposed directly or indirectly by the
> creditor as a consent to the extension of credit. The finance charge
> does not include charges of a type payable in a comparable cash
> transaction."

                                                                15 U.S.C. §1605(a).

Similarly, Regulation Z defines "finance charge" as follows:

> "(a) *Definition*.  The finance charge is the cost of consumer credit as a dollar
> amount. It includes any charge payable directly or indirectly by the consumer and
> imposed directly or indirectly by the creditor as an incident to or condition of the
> extension of credit. It does not include any charge of the type payable in a
> comparable cash transaction."

                                                                12 C.F.R. §226.4(a).

Thus, under TILA and Regulation Z, a "finance charge" is a charge which is (1) imposed directly

or indirectly by the creditor as *an incident to the extension of credit*, and (2) is *not payable in a*

*comparable cash transaction*.

In the instant case,  the Buy-Back Transactional Charges are properly considered a

finance charge as defined under TILA and Regulation Z.  These charges were paid by Ms.

Williams as an "incident to the extension of credit."  The only reason why Ms. Williams was

required to pay the charges was because Ms. Williams wanted to borrow money from the

Dealership and she had collateral in the form of the Jaguar to offer.  The Defendants inflated the re-purchase price of the Jaguar and caused Ms. Williams to pay the Buy-Back Transactional Charges because the transaction involved an *extension of credit*.  Accordingly, the Buy-Back Transactional Charges were charges which were incident to the extension of credit.

Further, the Buy-Back Transactional Charges and the Buy-Back Upcharge were "not payable in a comparable cash transaction."  As Ms. Williams owned the car before coming to the Dealership, there could be no "comparable cash transaction." Rather, the Dealership used the artifice of the sham Buy-Back Transaction to inflate the re-purchase price of the Jaguar to obtain additional profit in the form of the Buy-Back Transactional Charges and Buy-Back Upcharge. These additional charges could not ever be payable in a *comparable cash transaction* because the transaction was not to allow Ms. Williams to buy the Jaguar but to lend her money.

The Dealership violated TILA, 15 U.S.C. §1638(a)(3)(4), Regulation Z, 12 CFR §226.18(d) and (e) by failing to properly disclose the true "finance charge" and the  "annual percentage rate" of the finance agreement between the parties.  TILA states that any creditor that fails to comply  with any requirement under TILA with respect to any person shall be liable to such person. 15 U.S.C. §1640(a). *See*, e.g., *Parra v. Borgman Ford Sales, Inc*., 2001 W.L. 1836190 (W.D. Mich.) [District Court for the Western District of Michigan determined that defendant auto dealer violated TILA when it failed to disclose as a  finance charge, additional sales tax charged through to a purchaser resulting from dealership's inflation of the purchase price of the vehicle in order to off-set the  amount credited to a plaintiff for a non-existent trade-in]; *see*, also, *Pierson v. Courtesy Motors, Inc*., 2001 WL 34072209 (W.D. Mich. 2001).

In *Parra,* the Court recognized that the purpose of TILA was to foster the fair and

accurate disclosure of the terms of credit. 15 U.S.C. §1601(a). The *Parra* court was asked to determine whether sales tax on the increased price of a vehicle that resulted from the roll-over of "negative equity" from a trade-in was a "finance charge" under TILA. With respect to "negative equity," the Court stated:

> The issue here is whether the sales tax on the negative equity constitutes a finance charge. Under TILA, the "amount of the finance charge . . . shall be determined as the sum of all charges, to be able directly or indirectly by the person to whom the credit is extended, to impose directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. §1605 (a) ( 2001). According to the Federal Reserve Board ("the Board"), this definition "includes any charge payable directly or indirectly by the consumer imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. §226.4(a) (2001). This interpretation and its accompanying the official staff commentary are "dispositive in TILA cases unless the commentary is demonstrably irrational." *Clay v. Johnson*, 264 F.3d 744 (2001 W.L. 1008139, *3 7th Cir. 2001). Whether or not defendants are require to pay Michigan sales tax on a negative equity is irrelevant to determining whether the sales tax on the negative equity is a finance charge. Because as the defendant's employees admit (TL 's Br Supp. Exhibit 7 at 31-32), **sales tax would not have been charged on the Villager's negative equity in a cash transaction, this sales tax was a finance charge**. On other words, the sales tax was required for defendant's extension of credit to plaintiff.

> *Id*. at 836192. (emphasis added)

The Court also recognized that in light of the Board's Commentary, negative equity "must be reflected as an additional amount financed under §226.18(b)(2)." Id. Indeed, the Court observed that negative equity should have been included under "additional amounts paid to others on my behalf" under the form of the finance agreement used by the defendant dealership and that the dealership had a blank line on its form contract for the negative equity disclosure.

-14-

The *Parra* case is illustrative of the disclosure violation of Delray Auto Mall. If Delray Auto Mall had simply agreed to lend money to Ms. Williams without using the artifice of the sham Buy-Back Transaction, the Buy-Back Transactional Charges would not have been incurred. In a normal loan transaction, items such as sales tax and "dealer prep" are not charged to the consumer as the consumer is not purchasing anything from the lender. However, as the extension of credit to Ms. Williams was fabricated and dressed up as a retail installment sales transaction subject to the FMVRSFA, Delray Auto Mall charged *inter alia* sales tax and other fees in order to complete the transaction.[2]

**B.  MS. WILLIAMS HAS PROPERLY ALLEGED A CLAIM UNDER THE FMVRSFA  CONCERNING BOTH THE ASSESSMENT OF UNDISCLOSED FINANCE CHARGES IN EXCESS OF THE LIMITATIONS OF §520.08(1) AS WELL AS WITH RESPECT TO THE FORM AND CONTENT OF THE PURCHASE AND FINANCE AGREEMENT.**

**1.  Using the "math" provided by Defendants, Ms. Williams has properly pled a claim for an unlawful finance charge.**

In their Motion to Dismiss, Defendants provided a fairly detailed analysis of the maximum finance charge authorized under the FMVRSFA with respect to the Jaguar Buy-Back Transaction. According to Defendants, $11,928 was the "maximum amount of financing charges allowable" (Motion to Dismiss - p.9).  For purposes of the present argument, Ms. Williams would agree with Defendants with respect to this aspect of their math.

Again, the Defendants seem to ignore the sham "buy-back" character of the transaction.

_____

[2] As mentioned previously, the authority of Defendants to extend credit exists under the special usury law of the FMVRSFA, Florida Statute Chapter 520. However, as the extension of credit was not a *bona fide* "retail installment transaction" within the meaning of Florida Statute §520.02(13), Defendants do not have the protection of the FMVRSFA. In the fullness of time, Ms. Williams will demonstrate that Defendants lacked the license authority to make a loan under the other special usury law, the Florida Consumer Finance Act, Florida Statute Chapter 516.

According to the allegations of the Amended Complaint, Defendants through the sham Buy-Back Transaction charged approximately $10,000.00 in finance charges in the inflated "cash price" set forth in the Purchase and Finance Agreement. The aforementioned hidden interest was in addition to the disclosed "finance charge" of $10,359.76. Thus, according to the calculations of Ms. Williams, Defendants charged in excess of $20,000.00 in finance charges (exclusive of the Buy-Back Transactional Charges) for an extension of credit of approximately $4,300 (Amended Complaint - ¶¶35-38).

Assuming *arguendo* that the math of Defendants is correct, Defendants charged Ms. Williams at least approximately $9,000.00 more than the maximum rate authorized under Florida Statute §520.08. Ms. Williams has properly alleged a cause of action for violation of the FMVRSFA with respect to the permissible rate.

### 2. The Purchase and Finance Agreement does not satisfy the form and content requirements of the FMVRSFA.

In the instant action, Ms. Williams has claimed that the Purchase and Finance Agreement which is attached as Exhibit "A" to her Amended Complaint was the operative contract upon which the extension of credit was made to Ms. Williams by Delray Auto Mall. As referenced above, Defendants have attached an additional document to their Motion to Dismiss — the Disputed RISC — which purports to be the complete agreement with respect to the extension of credit to Ms. Williams. To be sure, a cursory review of the Purchase and Finance Agreement attached to the pleading of Ms. Williams demonstrates that Defendants did not provide the specific disclosure requirements under Florida Statute §520.07(1)(b) and (2)(a)(b)(c) and (d).

Assuming for the purposes of argument that the Disputed RISC is a genuine document,

the Disputed RISC nonetheless does not comply with the form requirements of the FMVRSFA.

Florida Statute §520.07(b) *inter alia* requires that any retail installment contract contain "a

specific statement that liability insurance coverage for bodily injury and property damage caused

to others is not included, if that is the case." The Disputed RISC plainly does not contain the

required insurance disclosure.

### C.  MS. WILLIAMS HAS PROPERLY ALLEGED A CLAIM FOR VIOLATION OF THE FLORIDA LENDING PRACTICES ACT, CHAPTER  687, AS A RESULT OF DEFENDANTS MAKING AN UNLAWFUL EXTENSION OF CREDIT THROUGH THE SHAM BUY-BACK TRANSACTION.

In determining whether a transaction is usurious under Florida law, the Court must look

at the substantive transaction and not the form or designation given to it by the parties.

*L'Arbalete, Inc. v. Zaczac,* 474 F.Supp.2d 1314 (S.D.Fla.2007).  "These usury statutes… show a

clear legislative intent to prevent an accomplishment of objects forbidden, by use of any scheme

or device whatsoever or by any indirect process." *Gilbert v. Doris R. Corp.,* 111 So.2d 682, 683-

684 (1959), *certiorari discharged,* 119 So.2d 792 (1959). Such basic principals are not

recognized by Defendants in the loan transaction with Ms. Williams.

In their Motion to Dismiss, the Defendants claim that the "effective interest rate charged

by Defendants would be 13%" (Motion to Dismiss - p.3). Ms. Williams is not certain as to how

the Defendants arrived at the effective interest rate, but she will assume that Defendants used a

simple interest calculator which used an initial amount borrowed of $19,880.24. According to

Ms. Williams, she received only approximately $4,300 from the loan transaction despite a

disclosed "amount financed" in excess of $19,000 (Amended Complaint - ¶¶ 35-37). The Sham

Downpayment, the Buy-Back Transactional Charges, and the Buy-Back Upcharge when added to

the Disclosed Finance Charge, raise the actual cost of credit to approximately $26,000.  Based on

-17-

the best "math" of Ms. Williams, using a simple interest calculator that starts with an initial

amount borrowed of $4,300, the interest rate is approximately **150%** — which exceeds the

interest cap of 18% by a country mile. To be sure, upon completion of discovery and employment

of an expert, Ms. Williams — an unsophisticated woman who was preyed upon by Defendants

— will be finally informed as to the actual rate of interest charged.

### D.  UNDER REVISED ARTICLE 9, UCC, MS. WILLIAMS IS ENTITLED TO CIVIL REMEDIES IRRESPECTIVE OF WHETHER THE COLLATERAL HAS BEEN DISPOSED OF BY FGAP INVESTMENT.

#### 1.  Overview of UCC Claim

With respect to her claim under Count IV of her Amended Complaint, Ms. Williams has

asserted that FGAP violated Article 9, Part VI of the UCC by failing to act in a commercially

reasonable manner with respect to the repossession of the Jaguar and by not providing Ms.

Williams with the required statutory notice of private or public sale as required under the UCC

(Amended Complaint - ¶¶ 72-72). [3] *See*, e.g., *Muro v. Hermanos Auto Wholesalers, Inc.*, 514

F.Supp. 2d 1343 (S.D. Fla. 2007)[defective notice of sale provided car buyer with statutory

damages of $9,803.55, despite actual damages of $5,000.00 downpayment].

#### 2.  Review of Uniform Commercial Code with respect to repossession of collateral.

U.C.C. Article 9 is the fundamental law regulating security interests and repossession of

personal property. Article 9 offers a framework for determining whether a creditor has a valid

security interest, when and how it can repossess and dispose of collateral, and the rights of

---

[3] In preparing the instant memorandum, Ms. Williams discerned that Ms. Williams had inadvertently alleged that the requisite notice of sale was not provided by the "Dealership" as opposed to the secured creditor, FGAP Investment. Contemporaneous herewith, Ms. Williams has filed an unopposed Motion to Correct Scrivener's Error to obviate the error.

-18-

creditor and debtor after repossession. When a party enforces its remedies under Article 9, Part VI, but fails to comply with its requirements, Florida Statutes §679.625 specifies the remedies of a debtor. Actual damages are available for any Article 9 violation. Further, if the collateral is consumer goods, §679.625(3)(b) makes minimum statutory damages available for almost any violation of Part VI, Article 9, including repossessions that breach the peace, defective notices of sale, and the failure to dispose of repossessed collateral in a commercially reasonable manner.

Even technical violations, such as failing to provide proper notice of sale or obtaining a waiver prohibited by Article IX, can trigger the consumer remedies. *See,* e.g., *Stoppi v. Wilmington Trust Company*, 518 A.2d 82 (Del. 1986); *Walker v. V.M. Box Motor Company*, 325 So.2d 905 (Miss. 1976); *Joyce v. Cloverbrook Homes, Inc.*, 344 SE 2d 58 (1986); *Erdman v. Rants*, 442 NW 2d 441 (N.D.1989)][consumer entitled to damages under former U.C.C.§9-507 (now U.C.C. §9-625) for lack of notice even though sale was commercially reasonable].

### 3. FGAP Investment was required to send the statutorily required notice of the sale or other disposition of the Vehicle.

Florida Statute §679.614 of the Uniform Commercial Code requires a specific written notice of sale or other disposition of repossessed collateral. The notice of sale is of utmost importance to the consumer. It tells a consumer when to expect loss of the property if actions are not taken to redeem it or otherwise to prevent the sale. It informs the debtor of the kind of sale to be held and gives the debtor the opportunity to attend the sale or to persuade friends, relatives and others to attend the sale and bid, best reducing the size of any deficiency or increase in the surplus. *See*, e.g., *In Re Hardy*, 17 U.C.C. Rep. Serv. 633 (Bankr. N.D. Ohio 1975); *HEW Federal Credit Union v. Battle*, 772 A.2d 252 (D.C.2001); *Thong v. M.H. Home Harbor, Inc.*, 3

S.W. 3d 377, 39 U.C.C. Rep. Serv. 2d 941 (Mont.C.T. App. 1999); *Willington Trust Company v. Connor*, 4015 A.2d 773, 28 U.C.C. Rep. Serv. 900 (Del. 1980).  It informs the debtor of important rights, particularly in a consumer-goods transaction.  Proper notice is an essential element of a commercially reasonable sale.

### 4.  The Failure of FGAP Investment to Comply with the Notice Requirements Set Forth in §679.614 Entitles Ms. Williams to a Mandatory Statutory Remedy.

FGAP Investment's failure to comply with its statutory notice obligations entitles Ms. Williams to a mandatory statutory remedy. The statute is clear and unambiguous: "[i]f the collateral is consumer goods, a person who was a debtor … at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation or the time-price differential plus 10 percent of the cash price."  Fla. Stat. § 679.625(2). *Lee County Bank v. Winson,* 444 So.2d 459, 463 (Fla. Dist. Ct. App. 1983) ("statutory damages under § 679.507 are available when a debtor is in default and a creditor proceeds not in accordance with the provisions of Part V, Article Nine, of Florida's Uniform Commercial Code"); *In re Johnson*, 328 B.R. 234, 236 (Bankr. M.D. Fla. 2005) (noting that a creditor's violation of a debtor's right to redeem entitles the debtor to damages); *see* also, *Ogletree v. Brokers South, Inc.,* 383 S.E.2d 900, 902 (Ga. Ct. App. 1989) ("Even if the consumer debtor does not prove a specific monetary loss but proves that the creditor did not comply with the statute, the debtor is entitled to recover the finance charge plus 10 percent of the principal amount of the contract if he or she proves those figures.") (citation omitted); *Chisholm v. Transouth Financial Corp*., 194 F.R.D. 538, 568 (E.D. Va. 2000) (holding that statutory minimal damages may be awarded "in any event" regardless of

finding of actual injury).

The comments relating to Florida's Article 9 statutory damage provision §679.625, instruct that subsection (3)(b) "provides a minimum, statutory, damage recovery for a debtor … in a consumer-goods transaction. It is patterned on former section 9-507(1) and is *designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted.*" Fla. Stat. § 679.625, comm. 4. (emphasis added).  As this comment makes clear, the language of subsection (3)(b) with respect to statutory damages reflects the Legislature's intent to give teeth to the notice provisions of Article 9 in consumer-goods transactions by providing for statutory damages for *every* noncompliance, irrespective of the existence of a deficiency or sale of the collateral.

### 5. *Revised Article 9 Eliminated the Requirement that the Secured Creditor Dispose of Collateral as a Condition Precedent to Civil Remedies*

In their Motion to Dismiss, Defendants state *inter alia* that "Plaintiff will not have a cause of action unless the Jaguar is sold or otherwise disposed of in a commercially reasonable manner."(Motion to Dismiss - P. 12). Defendants overlook that the drafters of Revised Article 9 eliminated the requirement that disposition of collateral occur in order for a debtor to obtain civil remedies.

Florida Statute §679.507(1) previously provided:

If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions.  **If the disposition has occurred** the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.  If the collateral is consumer goods the debtor has a right to recover in any event an amount not less than the credit service charge plus 10 percent of the principal

amount of the debt or the time price differential plus 10 percent of the cash price.

(emphasis added)<br>Florida Statute §679.507(1)

In enacting revised Article 9, the drafters eliminated the requirement that the collateral be disposed of as a condition to the recovery of damages.  As demonstrated by the current provision of §679.625(2), revised Article 9 changed the prior law by rendering the secured party liable for any non-compliance with Article 9 irrespective of whether the collateral was sold. The policy underpinning the change is self-evident from the commentary to Article 9.  To effectively police secured creditors from violating Article 9 - for acts ranging from breach of the peace to improper notices - the UCC drafters gave the civil remedies provision the aforementioned "teeth."

The operative section of §679.625(2) does not contain language which would limit the right of Ms. Williams to bring a claim against FGAP Investment to only instances where FGAP Investment has disposed of the Jaguar.  If the Florida legislature had intended to limit the recovery of civil damages as argued by Defendants, it would have so stated. The basic canon of statutory instruction is that a court must give effect to the plain and unambiguous language of the statute. *Owens v. Samkle Automotive, Inc.*, 425 F.3d 1318, 1321 (11th Cir. 2005).  "In other words, a court must presume that Congress said what it meant and meant what it said." Id., quoting *Harry v. Marchant*, 291 F.3d 767, 760 (11th Cir. 2002).  This position is especially compelling as the legislature had knowledge of the limiting language of old Article 9.

### E.  MS. WILLIAMS HAS PROPERLY ALLEGED A CLAIM FOR VIOLATION OF THE DUTPA WITH RESPECT TO BOTH THE GENERAL AND SPECIFIC DETAILS OF THE BUY-BACK TRANSACTION.

#### 1.  The DUTPA Requires a Liberal and Expansive Interpretation

Florida Statute §501.204, entitled "Unlawful Acts and Practices," provides:

-22-

(1)   Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2)   It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1).

Florida Statute §501.204

The Florida Legislature has directed that the DUTPA is to be "construed liberally." Florida Statutes §501.202. *See*, e.g., *Cummings v. Warren Henry Motors*, 648 So.2d 1230 (Fla. 4th DCA 1995); *Samuels v. King Motor Company of Ft. Lauderdale*, 782 So.2d 489 (Fla. 4th DCA 2001). The protections of the DUTPA extend to those who are damaged *or*  aggrieved because of the deceptive practices of a business. *Klinger v. World Weekly News, Inc.*, 747 F.Supp 1477 (S.D. Fla. 1990)["legislature's use of word "anyone" in §501.211(1), instead of word "consumer" seems deliberate and implies the scope of the injunction remedy is broader than the actual damage remedy." Id. at 1480]; *See* also, *Macias v. HBC of Florida, Inc.*, 694 So.2d 88 (Fla. 1997)[ "the clear intent of the statute as expressed by its plain language is to provide both equitable and legal remedies to private consumers who are aggrieved parties **and/or** who sustained actual losses because of violations under the FDUTPA".]

### 2.  *The Scam Buy-Back Transaction is a Deceptive and Unfair Trade Practice Proscribed Under Florida Statute §501.204(1).*

In their Motion to Dismiss, Defendants make the incredulous argument that Ms. Williams has not properly pled a cause of action under the DUTPA with respect to the scam Buy-Back Transaction. Indeed, Defendants go so far as to even suggest that "Plaintiff recognizes that 'buy back' transactions are legal under Florida law" (Motion to Dismiss - p.14).  Again, Defendants

feign ignorance that the scam transaction was designed to purloin thousands of dollars of equity in the vehicle in violation of the DUTPA. *See,* e.g., *State Dept. of Agriculture and Consumer Services, Division of Consumer Services v. Quick Cash of Tallahassee,* 609 So.2d 735 (Fla.1st DCA 1992) [Division of Consumer Services had standing to bring claim under the DUTPA to challenge practice of usurious loans which disguised interest charged on the loans through use of automobile to consumers for a "rental fee"]; *Quick Cash Clearwater, Inc. v. State Dept. of Agriculture and Consumer Services, Division of Consumer Services,* 605 So.2d 898 (Fla.2nd DCA 1992) [Division of Consumer Services had authority to seek injunction against pawnbroker's alleged unlawful conduct in acting as consumer finance company in attempt to evade usury law by collecting disguised interest charges in the form of weekly rent payments for pawned automobiles]; *cf., Fast Funding the Company v. Betts,* 758 So.2d 1143 (Fla. 5th DCA 2000) [discussion of complaint for usury and UDAP violation for lending "under the guise of a payment instrument sale"].

### 3.  *Ms. Williams Has Properly Alleged Per Se Violations of the DUTPA.*

### a.  **The Violation of the FTC Used Car Rule is a *Per Se* Violation of the DUTPA.**

Defendants in their Motion to Dismiss completely overlook the specific allegations of the Amended Complaint that set forth *per se* violations of the DUTPA. Ms. Williams has alleged *inter alia* that the Dealership failed to comply with the requirements of 16 C.F.R.§445, entitled the "FTC Trade Regulation Rule on the Sale of Used Motor Vehicles," known more commonly as the "FTC Used Car Rule" ("FTC Used Car Rule") (Amended Complaint - ¶¶ 83-87). The Florida legislature has defined a "violation of this part" to mean "any violation of any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. §41, *et sequi*."  Florida

Statute §501.203(3)(a). Further, Florida Statute §501.204(2) directs that in construing the DUTPA "due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to the FTC Act." Thus, any violation of the Used Car Buyer's Rule is a *per se* violation of the FTC Act.

In recent years, the FTC has brought repeated enforcement actions for Used Car Buyer's Rule violations. *See*, e.g., *United States v. Michael Auto Sales, Inc.*, 5 Trade Reg. Report ¶23, 216 (D. Maryland 1992); *United States v. Credit Card Connection*, 5 Trade Reg. Report ¶23, 148 (M.D. Fla. 1992). Further, similar state statutes have been interpreted to hold that the failure to post the Used Car Buyers Guide is a UDTPA violation. See*, e.g., *Buskrik v. Harrell*, 2000 WL 943782 (Ohio Ct. App. 2000);*cf*., *Lawhorn v. Joseph Toyota, Inc*., 750 N.E. 2d 610 (Ohio App. 2001).

This Court has previously held that the failure to post the required Spanish language Used Car Buyer's Guide constitutes a DUTPA violation. *See, Martinez v. Rick Case Cars, Inc.,* 278 F.Supp.2d 1371 (S.D.Fla. 2003). Ms. Williams has stated a claim for violation of the DUTPA with respect to the failure of the Dealership to comply with the FTC Used Car Rule.

**b.  Ms. Williams Has Properly Alleged a Per Se Violation of the DUTPA as Same Particularly Pertains to Motor Vehicle Sales.**

In the Amended Complaint, Ms. Williams has alleged the Dealership unlawfully charged the sum of $299.00 as and for a "dealer prep" fee ("Dealer Prep Fee"). In 2001, the Florida legislature substantially amended the DUTPA to add an entire section dedicated solely to motor vehicle sales.  Part VI of the DUTPA provides a laundry list of the acts or practices of automobile dealership that are unfair and deceptive. Among the listed proscribed acts, Florida

Statute §501.976(18) specifically requires that any pre-delivery service charge such as the Dealer

Prep Fee provide the following disclosure:

> "[t]his charge represents cost and profit of dealer for items such as
> inspecting, cleaning, adjusting vehicles, and preparing documents
> related to the sale."

Once again, Defendants completely overlook this *per se* violation of the DUTPA. *See,*

e.g., *F.D.S. Autos, Inc. v. Chrcanowski,* 976 So.2d 600 (Fla.1st DCA 2007)[decision addressing

the arbitration of class claims against dealership which charged $370.70 as an "administrative

and documentary fee" or "administrative and state fee" in connection with vehicle sales in

contravention of §§501.976(11) and 501.976(18), Florida Statutes]. Ms. Williams has stated a

claim for violation of the DUTPA with respect to the so-called "dealer prep" fee.

### F.   REVISED ARTICLE  9 SPECIFICALLY PROVIDES FOR JUDICIAL INTERVENTION TO RESTRAIN COLLECTION, ENFORCEMENT OR DISPOSITION OF COLLATERAL UNDER APPROPRIATE TERMS AND CONDITIONS.

In their Motion to Dismiss, Defendants argue that Ms. Williams is not entitled to

injunctive relief with respect to the disposition and sale of her Jaguar. According to Defendants,

"Florida law has been very clear not to allow claims for equitable relief that are not established

causes of action under Florida law" (Motion to Dismiss - p.16).

Contrary to the argument of Defendants, the Florida legislature in adopting revised

Article 9 has specifically provided for a cause of action for injunctive relief:

679.625 Remedies for failure to comply with article

(1) If it is established that a secured party is not proceeding in accordance with
this chapter, a court may order or restrain collection, enforcement, or disposition
of collateral on appropriate terms and conditions. This subsection shall not
preclude a debtor other than a consumer and a secured party, or two or more
secured parties in other than a consumer transaction, from agreeing in an

-26-

authenticated record that the debtor or secured party must first provide to the alleged offending secured party notice of a violation of this chapter and opportunity to cure before commencing any legal proceeding under this section.

Florida Statute §679.625(1)

The UCC provides for injunctive remedies to an aggrieved debtor such as Ms. Williams. Ms. Williams does not want her valuable property sold to pay an  unlawful debt. It is incumbent upon this Court to restrain the Defendants from selling her car.

## V.  CONCLUSION

As detailed in the above argument, Ms. Williams has alleged sufficient facts to support claims under the state and federal consumer protection acts. The position of Defendants that they have no responsibility to act honestly or to provide specific state and federal disclosures to inform Ms. Williams of the cost of her purchase of credit is contrary to the basic tenets of consumer protection law. In short, Defendants advocate a position which is reasonably calculated to cause a "race to the bottom" which will damage law-complying businesses as well as consumers.

In the event the Court determines that Ms. Williams has not properly or completely plead any material issue, Ms. Williams would respectfully request this Court grant Ms. Williams leave to make appropriate amendments so as to proceed further.

Respectfully submitted,


/s/ Robert W. Murphy
ROBERT W. MURPHY
Florida Bar No.: 717223
1212  S.E. 2nd Avenue
Ft. Lauderdale, FL 33316
(954) 763-8660 Telephone
(954) 763-8607 Telecopier
Email: rphyu@aol.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 15, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on Kevin H. Fabrikant, Esquire, Foreman Friedman, P.A., One Biscayne Tower, Suite 2300, 2 South Biscayne Boulevard, Miami, FL 33131, in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.


/s/  Robert W. Murphy

-28-